UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| THROUGHPUTER, INC., | |
| Plaintiff, | C.A. No. 1:25-cv-01625 |
| v. | **JURY TRIAL DEMANDED** |
| GOOGLE LLC, | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ThroughPuter, Inc. ("Plaintiff" or "ThroughPuter") files this Complaint and demand for jury trial seeking relief from patent infringement of the claims of U.S. Patent Nos. 8,561,078; 8,789,065; 10,318,353; 10,133,599; and 10,310,902 (collectively, the "Patents-in-Suit" or "Asserted Patents") by Google LLC ("Defendant" or "Google").

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

2.      ThroughPuter brings this action to halt Google's infringement of its rights under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, which arise under U.S. Patent No. 8,561,078 (Ex. 1, "the '078 patent"); U.S. Patent No. 8,789,065 (Ex. 2, "the '065 patent"); U.S. Patent No. 10,318,353 (Ex. 3, "the '353 patent"); U.S. Patent No. 10,133,599 (Ex. 4, "the '599 patent"); and U.S. Patent No. 10,310,902 (Ex. 5, "the '902 patent").

## THE PARTIES

3.      Plaintiff ThroughPuter, Inc. is a Delaware corporation having a place of business at 201 N Union St #110 Alexandria VA 22314. Plaintiff owns over 50 issued domestic and foreign patents and pending patent applications protecting its products, services and technologies.

ThroughPuter's President, Mark Sandstrom, is the named inventor on each of such patents and applications and the inventor of the technology disclosed and claimed in ThroughPuter's patents and patent applications.

4. Plaintiff has been a member of The College of William & Mary's Launchpad business incubator, which is associated with the Alan B. Miller Entrepreneurship Center.

5. Plaintiff has developed and continues to develop various products and services, including i) Estimator™, a machine learning Application Specific Processor (ASP)-as-a-service offering of the ThroughPuter Platform-as-a-Service (PaaS) project, and ii) Grafword™, an artificial intelligence (AI)-powered, graphical authentication service that is a pilot application of the Estimator™ machine learning microservice.

6. Estimator™ provides a streaming machine learning (ML) microservice that supports AI applications in unpredictably changing operating environments. Estimator™ allows its prediction models and logic parameters to be adjusted continuously while the microservice is in operation, such that its predictions will stay tuned-in to the prevailing reality of its dynamic operating environment. An International Search Report recently conducted by the International Searching Authority under the Patent Cooperation Treaty concluded that this technology is patentable. A beta version of the Estimator™ application programming interface is currently commercially available for third-party developer subscription at www.estimatorlab.com.

7. Grafword™ provides graphic-based, high-security password generation and authentication. It adjusts the difficulty of the login challenge depending on how different a user's current behavior or session details are compared to what is normally expected for that user. Grafword™ thus provides both high security as well as convenience in online authentication for authenticated users. An International Search Report recently conducted by the International

Searching Authority under the Patent Cooperation Treaty also concluded that this technology is patentable. A beta version of Grafword™ is used for Estimator™ account creation and login at https://estimatorlab.com/landing.

8.    Both Estimator™ and Grafword™ have the potential to change the space in which they are offered due to the advantages provided by ThroughPuter's claimed inventions such as increased throughput and low latency.

9.    On information and belief, Defendant is a wholly owned subsidiary of Alphabet Inc., and a Delaware limited liability company, with an established place of business at 500 West 2nd Street, Austin, Texas 78701.

10.    On information and belief, Defendant sold and offered to sell products and services throughout Texas, including in this judicial district, and introduced products and services that perform infringing methods or processes into the stream of commerce knowing that they would be sold in Texas and this judicial district.

## JURISDICTION AND VENUE

11.    This is an action for patent infringement which arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*.

12.    This Court has subject matter jurisdiction at least under 28 U.S.C. §§ 1331 and 1338.

13.    Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b) because Defendant has committed acts of infringement and has a regular and established place of business in this District.

14.    This Court has personal jurisdiction over Google in this action because Google has committed acts of infringement within this District giving rise to this action, has a regular and

established place of business in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction over Google would not offend traditional notions of fair play and substantial justice. Google, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products and/or services in Texas and the Western District of Texas, regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in Texas.

15.    Upon information and belief, Defendant and its employees use the Titanium System that embodies the inventions claimed in the Patents-in-Suit within this District for business purposes, which constitutes an act of infringement from at least Google's facility at 500 West 2nd Street, Austin, Texas 78701. Witnesses knowledgeable about the internal use of the Accused Products (defined below) are located in this District.

16.    Defendant has substantial business contacts within this District and has purposefully availed itself of the privileges and benefits of the laws of the State of Texas.

## BACKGROUND

17.    This case involves ThroughPuter's patented cloud computing, computing acceleration, network acceleration, and related technologies, which were developed starting in 2010.

18.    Since 2010, advancements in computing technologies have generally fallen into two categories: high performance computing and utility or cloud computing. For high performance computing, the main objective is to maximize the processing speed of a given computationally intensive program running on dedicated hardware. In this field, speed was traditionally achieved by assigning a combination of separate parallel processors to all work on the same program

simultaneously. For utility or cloud computing, the main goal is to most efficiently share a given pool of computing hardware resources among a large number of client application programs. The former efforts pursue maximizing processing speed of a single program, while the latter efforts pursue maximizing utilization of processing capacity.

19.    When ThroughPuter's pioneering patent filings began in 2011, there had not been major synergies between the effort to increase processing speed of a single program while also maximizing processing capacity utilization. Indeed, pursuing one of these traditional objectives often happened at the expense of the other, placing the two objectives in tension with each other.

20.    For instance, assigning a dedicated parallel-processing supercomputer to each individual application would speed up that application, but it would also waste computing resources, since a portion of the capacity would be idle much of the time. On the other hand, improving utilization of computing systems by sharing their processing capacity among several applications would lead to enhanced resource utilization, but tended to slow down processing of individual programs. As such, the overall cost-efficiency of computing was not improving as much as developments toward either of these two traditional objectives would imply: increases in processing speed came at the expense of system utilization efficiency, while overall system utilization efficiency maximization came at the expense of individual application processing speed.

21.    The foregoing tension was exacerbated by the fact that even mainstream application performance requirements were increasingly exceeding the processing throughput achievable from a single Central Processing Unit (CPU) core, e.g., due to the practical limits being reached on the CPU clock rates. This gave rise to a growing need for increasingly fine-grained intra-application parallel processing in order to maintain acceptable performance levels, particularly as such

software was increasingly deployed on cloud computing platforms where processing resources are shared among applications belonging to multiple clients.

22.     These internally parallelized and/or pipelined (i.e., concurrent) enterprise and web applications were ultimately deployed, in large part, on shared cloud computing infrastructure by entities such as Defendant, using the technologies patented, pioneered, and promoted by ThroughPuter.

23.     Thus, in 2011, there existed a need for a new parallel computing architecture that could support several concurrent applications on shared parallel processing resource pools. This system needed to enable increasing the speed of executing application programs (including through execution of a given application in parallel across multiple processor cores and/or using hardware accelerators) while simultaneously improving the utilization of the available computing resources. At the same time, work traditionally performed by CPUs could be offloaded to specialized hardware to accelerate various functions, including networking and computing.

24.     To address these problems, ThroughPuter developed hardware-implemented resource management functionality, including a scheduler, placer, inter-task communications, and input/output system, for use with multicore processor arrays that can optionally be dynamically shared among multiple concurrent applications. ThroughPuter's technology provided a cloud computing solution that enables accelerated processing speeds, performed in hardware, across multiple application programs while simultaneously optimizing processing resource utilization.

25.     ThroughPuter's innovation results in optimized on-time processing throughput across the programs sharing an array of manycore processors. The client or end-user of an accelerated service receives increased processing speed and reduced cost base for delivering the

application service, such that it becomes economically feasible for cloud service providers to support a range of performance intensive applications without charge to end-users.

26.    In recognition of ThroughPuter's innovative achievements, ThroughPuter's Mark Sandstrom was invited to speak at various high performance and cloud computing conferences starting in 2012. GigaOm selected ThroughPuter as one of eleven finalists to present at Launchpad 2012 in San Francisco, California. That same year, ThroughPuter was invited to present certain of its technology-based PaaS approach at the high-performance computing start-up showcase at the Supercomputing 2012 conference ("SC12") in Provo, Utah.

27.    ThroughPuter's novel manycore fabric led to industry recognition of ThroughPuter and its technology. For example, in January 2013, ThroughPuter was invited to publish an article in the Cloud Computing Journal, discussing PaaS based on novel manycore fabric. *See* Ex. 6.

28.    In addition, in September 2014, Mr. Sandstrom presented at the FPGAworld Conference in Stockholm, Sweden, on the topic of *Hardware Implemented Scheduler, Placer, Inter-Task Communications and IO System Functions for Manycore Processors Dynamically Shared among Multiple Applications*. *See* Ex. 7.

29.    By the time of the 2014 FPGAworld Conference, ThroughPuter had already been granted at least a dozen U.S. and United Kingdom patents protecting techniques enabling the advantages of its Dynamic Parallel Execution Environment™ (DPEE).

30.    The following year, ThroughPuter was invited to present at the 2015 HPC Advisory Council Conference in Spain on the topic of executing multiple dynamically parallelized programs on dynamically shared cloud processors. A copy of the presentation is attached as Exhibit 8.

**DEFENDANT'S INFRINGING TITANIUM SYSTEM**

31.    Defendant's Google Cloud Platform (GCP) data centers include the "Titanium System," which consists of network interface cards that use Intel E2000/2100/2200 Infrastructure

Processing Units ("IPUs") to handle networking tasks including data packet routing to and from a host server and include "Titan security microcontrollers," "Titanium adapter," "Titanium SSD," and "Titanium offload processors (TOPs)." *See* Ex. 10 at 1; *see also* Exs. 9, 11–13, 15.  Google's TOP IPUs are a "scalable and flexible way to offload network and I/O processing from the host CPU onto silicon devices deployed throughout the data center." Ex. 10 at 1. According to Google, "Titanium delivers more compute and memory resources for your workloads by offloading processing from the host hardware." *Id.* at 2; *see* Exs. 9, 11–13, 15.

32.     Google's Titanium System includes Titanium Offload Processors, which Google refers to as "infrastructure processing units" ("IPUs"), that handle network data packet processing, among other things. *See* Exs. 9–13, 15. Google's TOP IPUs within the Titanium System handle packet flows from one server to another in a data center. *See, e.g.*, Ex. 23. The packet flows are often created by one virtual machine that is communicating with another virtual machine running on another server in the same data center. *Id.* The Google TOP IPUs, as configured with software for execution on the on-board core array (as discussed below), are the products accused of infringement in this Complaint ("Accused Products" or "Accused TOP IPUs").[1]

33.     The Accused TOP IPUs were co-developed by Google and Intel and are named the E2000, E2100, and E2200 systems-on-a-chip (SoCs), which have similar components and functionality. *See* Exs. 12–13, 15, 21. The Accused TOP IPUs include a variety of complexes (or "subsystems"), including a networking complex and a compute complex. *See* Exs. 12–13, 15, 20–21. The networking complex, which is responsible for handling data communication, includes a Peripheral Component Interconnect Express (PCIe) connection to the local host, an Ethernet

---

[1] Plaintiff expressly reserves the right to expand, modify, or otherwise alter its identification of Accused Products as this case progresses.

connection to external servers, and a packet processing pipeline with a traffic shaper to parse packet headers to direct the packets for additional processing or for transmission. *See* Exs. 12–13, 15, 20–21. The compute complex is a group of processing elements that includes an array of cores and a system-level cache shared between the network and compute complexes. *Id.*

34.    The Accused TOP IPUs are considered manycores as each Accused TOP IPU has an array of Arm N1 Neoverse CPUs (referred to here as an array of "N1 cores")[2], which "allows customer-provided software to execute features, ranging from complex packet-processing pipelines to storage transport, device management, and telemetry." Ex. 11 at 1; Ex. 21 at 8 (packet processing connected to the compute complex for "handoff to software"). Each N1 core has a memory system with multiple cache levels, including fast L1 memory caches for instructions (I-cache) and for data (D-cache), a larger L2 memory cache, and access to the system level cache. Ex. 16 at 4–5; Ex. 24 at 2. The N1 cores are interconnected to each other and to the Accused TOP IPU's acceleration hardware and system memory (system level cache and dynamic random-access memory (DRAM), either through the Arm CoreLink CMN-600 Coherent Mesh Network (CMN) or an on-chip mesh network interconnect with equivalent functionality. *See, e.g.*, Ex. 13 at 4 ("Coherent Mesh Network interconnect with 32MB System Level Cache (SLC)"); Ex. 21 at 8 ("Shared Mesh SLC"); Ex. 11 at 3; Ex. 16 at 7. The N1 core array includes an interface called the DynamIQ Shared Unit (or other hardware with equivalent function, referred to herein collectively as "DSU") that links the N1 cores and the mesh network interconnect to the rest of the IPU. *See* Ex. 26 at 17 ("The Neoverse N1 is required to have the *DynamIQ Shared Unit* (DSU) as an interface between the CPU and the external interconnect. The DSU is a separate piece of logic,

---

[2] The E2200 chip includes N2 processors, which have the same functionality described herein for the N1 processors in the E2000 and E2100 chips. Ex. 15; *also compare* Ex. 25 *with* Ex. 28.

and contains all external interfaces for the Neoverse N1, including the bus interface, the power management interface, the interrupt controller interface, as well as all power and clocking interfaces."); *see also* Ex. 25 at 23; Ex. 28 at 37; Ex. 28 at 30. Cross-connects between cores and the rest of the compute complex, including the system level cache, are mediated by the DSU. *See* Ex. 26 at 17.

35.    Google loads software on the TOP IPUs to perform various packet processing tasks. Ex. 11 at 1 (The N1 core array "allows customer-provided **software [programs]** to execute features, ranging from complex packet-processing pipelines to storage transport, device management, and telemetry.") (emphasis added). Examples of the tasks performed by the N1 cores on the packets include complex or stateful tasks such as TCP encapsulation, application-level gateways, network overlays, multi-packet NAT, telemetry and tracking, metering, system-wide load balancing and flow control.

36.    The Accused TOP IPUs have a programmable packet processing pipeline with packet prioritization and telemetry built in the network subsystem. Ex. 21 at 6, 8. The networking complex includes hardware-based data packet processing, including a programmable data packet processing pipeline and a hardware-based traffic shaper. Exs. 11–13, 15. The packet processing hardware is configured using the P4 programming language to accommodate the particular needs of a given use case, while the traffic shaper applies load balancing, flow, and/or congestion control protocols to optimize quality of service (QoS). *See, e.g.*, Exs. 11, 13; Ex. 21 at 6, 8. For complex packet processing involving both hardware packet processing on the packet processing pipeline and software packet processing on the N1 cores, the traffic shaper provides scheduling to accomplish load balancing, flow, QoS and/or congestion control on the N1 cores. *See* Ex. 20 (showing the traffic shaper in the flow between the packet processing pipeline and the system level

cache). The load balancing, flow, QoS and/or congestion control mechanisms generally include prioritization to ensure that a given packet flow is handled in a manner that enables the system to meet the latency requirements of the various end users or processes running in the data center. *See, e.g.*, Exs. 18–20.

37.    In Google's Titanium System, each Accused TOP IPU can either operate individually or in combination with others to form a unified system or platform. For example, a first Titanium processor receives data packets from its host (e.g., through a PCIe interface), transforms the packets (in its packet processing engine), and transmits the transformed packets to a remote server (e.g., over an ethernet interface). *See generally* Ex. 10 at 2; Exs. 12–13. A second Titanium processor at the remote server receives the packets (e.g., through an ethernet interface) and transforms them with its packet processing engine before transmitting them to its own host (e.g., through a PCIe interface). *Id*. Each packet processing engine (one on the sending Titanium processor and another on the receiving Titanium processor) executes a set of packet processing programs. *Id*.

38.    A program instance refers to an execution of a specific program that is processing or is to process a specific data packet on a particular core or set of cores. Each program includes one or more processing steps, which are examples of tasks as understood by a skilled artisan. A non-limiting example of a task instance would be a specific core performing a certain task on a particular data packet. Thus, in an example, a program instance may comprise one or more task instances. Those tasks instances are hosted at processing stages in a packet processing program instance "offloaded" to the Accused TOP IPUs. Those tasks would have otherwise been performed in software on the server's CPU, reducing its computing capacity and increasing its power consumption. *See generally, e.g.*, Ex. 10–13.

39.     Defendant has been and is presently infringing, and will continue to infringe, the Asserted Patents in this District and elsewhere in the United States by, among other things, making, using, selling, offering for sale, and/or importing the Titanium System's TOP IPUs.

40.     Defendant directly infringes the Asserted Patents pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, or both.

41.     Defendant also indirectly infringes the Asserted Patents by encouraging, instructing, directing, and requiring others, including its customers, purchasers, users, and developers, to use the processing systems of the Asserted Patents, either literally or under the doctrine of equivalents, or both.

**COUNT ONE**
**DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,561,078**

42.     ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

43.     On October 15, 2013, the United States Patent and Trademark Office duly and legally issued the '078 patent, titled "Task Switching and Inter-Task Communications for Multi-Core Processors." *See* Ex. 1.

44.     Mark Sandstrom is the sole and true inventor of the '078 patent. *Id.*

45.     ThroughPuter owns all rights, title, and interest to and in the '078 patent.

46.     On information and belief, Defendant has and continues to infringe one or more claims of the '078 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the Accused TOP IPUs.

47.     The Accused TOP IPUs include all the limitations of at least claim 1 of the '078 patent. Claim 1 is representative of the claims infringed by Defendant and recites:

1.  A data processing system comprising:

an array of processing cores for processing a set of software programs configured to run on the data processing system, with each software program among the set of software programs comprising its list of tasks to be processed;

a hardware logic module, referred to as a controller, for repeatedly assigning individual processing cores of the array of processing cores to process individual tasks of each software program among the set of software programs;

a memory providing task-specific memory segments; and

a hardware logic module, referred to as a cross-connect, for connecting the array of processing cores and the task-specific memory segments of the memory, wherein the controller configures at least one of the following: (a) at least one given task-specific multiplexer among a set of task-specific multiplexers within the cross-connect to connect a processing core of the array of processing cores to such a task-specific memory segment that is specific to the same task as the given task-specific multiplexer, and (b) at least one given core-specific multiplexer among a set of core-specific multiplexers within the cross-connect to connect a task-specific memory segment to such a core of the array of processing cores that the given core-specific multiplexer is specific to.

48.    The Accused TOP IPU is a **data processing system.**

49.    The Accused TOP IPU is a "a system-on-a-chip" that provides "highly programmable packet processing." *See* Exs. 10–13, 15, 20. "Packet processing" refers to data packet processing, so the Accused TOP IPU is an example of a **data processing system.**

50.    The Accused TOP IPU includes **an array of processing cores for processing a set of software programs configured to run on the data processing system, with each software program among the set of software programs comprising its list of tasks to be processed.**

51.    The Accused TOP IPUs each have an array of Arm N1 Neoverse CPUs (**an array of processing cores**), which "allows customer-provided **software [programs]** to execute features, ranging from complex packet-processing pipelines to storage transport, device management, and telemetry." Ex. 11 at 1 (emphasis added); *See* Ex. 21 at 8 (packet processing from the "packet processing pipeline" is "[t]ightly coupled with the Compute Complex" array of N1 cores for "handoff to **software**" (emphasis added)); Exs. 12–13, 15, 20–21. The N1 cores handling the data

packet processing as part of the complex packet processing pipelines are **processing cores**. The N1 cores process data packets according to specific processing instructions provided by customers (the collection of tasks that are executed according to the instructions being an example of **software programs configured to run on the data processing system**). *Id.*; Ex. 11 at 1. Each of the N1 cores configured for operation in a data packet processing pipeline is programmed to perform an assigned packet processing operation (**task**) on the data packets. Different packet flows require different packet processing operations, thus requiring differently configured cores for processing. As noted above, examples of the tasks performed by the N1 cores on the packets include complex or stateful **tasks** such as TCP encapsulation, application-level gateways, multi-packet NAT, telemetry and tracking, metering, system-wide load balancing and flow control (hereinafter, this is sometimes referred to as the "complex packet processing pipeline"). A given set of packet processing **tasks** (which set represents a **list of tasks**) required for a given packet flow is a packet processing **software program**. There are many different packet flows needing different combinations of packet processing tasks and collectively these operations are part of a **set of software programs** offloaded to the Accused TOP IPU hardware for processing. *Id.*

52. The Accused TOP IPU includes **a hardware logic module, referred to as a controller, for repeatedly assigning individual processing cores of the array of processing cores to process individual tasks of each software program among the set of software programs.**

53. The Accused TOP IPU includes packet processing pipeline and traffic shaper hardware along with a coherent mesh network that includes network controller hardware for controlling connections between on-chip components (the packet processing pipeline, traffic shaper, and network controller hardware being an example of a **hardware logic module** or

**controller**), which assigns individual N1 cores to process individual tasks by directing packets that require specific processing to input buffers that are specific to cores that handle that processing. The packet processing pipeline, traffic shaper and related hardware (controller) assigns data packets to input buffers on a per-flow basis (to maintain isolation among the packet flows) as they arrive on data inputs, as discussed further below. Ex. 13 at 3. The controller maintains a cache holding per-queue state information, including whether the queue is empty and any priority or weighting it assigns to the queue. Exs. 11–13, 15, 21. Each packet flow requires a distinct set of packet processing operations based on its characteristics (e.g., tunneled, encrypted, etc.), as also discussed further below. Each processing operation is a task and the series of tasks required for a given packet flow is a program. Each packet flow is assigned to a given core and isolated from the remaining flows for security reasons, and at least in this way a core is assigned to a flow and the associated tasks. As the packet flows terminate and new flows initiate, this process is repeated (i.e., **repeatedly assigns individual processing cores of the array of processing cores to process individual tasks of each software program among a set of software programs**). *Id.*

54. The Accused TOP IPU includes **a memory providing task-specific memory segments**.

55. In the Accused TOP IPU, the packet processing pipeline and traffic shaper hardware is connected to the compute complex (including the N1 core array) through the "System Level Cache" for hardware "handoff to software." *See* Ex. 21 at 7–8; Ex. 11 at 2 (in the Accused TOP IPU, "[t]he compute complex is tightly coupled with the network subsystem allowing accelerators to access the system-level cache as a last-level cache providing high-bandwidth and low-latency connections. This architecture enables a combination of hardware and software packet processing allowing for custom configurations."); Ex. 20. The "handoff" includes sending data

packets to the system level cache that is segmented into input buffers, with each buffer configured to hold data packets of a given packet flow (as noted above), each requiring the same specific processing task or set of specific processing tasks to be performed by the N1 core array on the data packets in the buffer. The system level cache is thus **a memory providing task-specific memory segments.** Ex. 20.

56.    The Accused TOP IPU includes **a hardware logic module, referred to as a cross-connect, for connecting the array of processing cores and the task-specific memory segments of the memory, wherein the controller configures at least one of the following: (a) at least one given task-specific multiplexer among a set of task-specific multiplexers within the cross-connect to connect a processing core of the array of processing cores to such a task-specific memory segment that is specific to the same task as the given task-specific multiplexer, and (b) at least one given core-specific multiplexer among a set of core-specific multiplexers within the cross-connect to connect a task-specific memory segment to such a core of the array of processing cores that the given core-specific multiplexer is specific to.**

57.    In the Accused TOP IPU, data packets from the input buffers in the system level cache (**task-specific memory segments**) are sorted or **connected** based on hardware logic in the chip coherent mesh network (**hardware logic module** or **cross-connect**) to the appropriate N1 **cores in the array** running the program tasks. Exs. 26, 27; Ex. 14 at 6. The many-buffers-to-one processing core sorting is a multiplexing operation performed at least in part by one or more **multiplexers configured by the controller** within the **cross-connect**. The N1 cores are interconnected to each other, to the IPU acceleration hardware, and the system level cache, either through the Arm CoreLink CMN-600 Coherent Mesh Network or another on-chip coherent mesh network interconnect or **cross-connect** with equivalent functionality. *See, e.g.*, Ex. 13 at 4

("Coherent Mesh Network interconnect with 32MB System Level Cache (SLC)"); Ex. 21 at 8 ("Shared Mesh SLC"); Ex. 16 at 7. The coherent mesh network (or equivalent) provides the physical hardware multiplexed connection between an N1 core and all of the input buffers in the system level cache, through "high-bandwidth and low-latency connections." Exs. 11 and 20. The packet processing pipeline provides data packets to the system cache, segmented into input buffers (**task-specific memory segments**), which the N1 processors connect to through the coherent mesh network (**cross-connect**), each N1 processor being able to access all of the memory segments in the system cache through the coherent mesh network, with any input buffer mapped to a respective N1 core being a multiplexing operation performed by the coherent mesh interconnect, including with one or more multiplexers (i.e., **one given task-specific multiplexer among a set of task-specific multiplexers within the cross-connect connects a processing core of the array of processing cores to such a task-specific memory segment that is specific to the same task as the given task-specific multiplexer**). Exs. 16, 26, 28.

58.    With reference to sub-element (b): The CMN network controller on the Accused TOP IPU is configured to connect all input buffers in the system level cache (**task-specific memory segments**) to each core in the N1 core array **within the cross-connect**, thus each core in the **array of processing cores** has at least one multiplexing element (**core-specific multiplexer**) that selects the input buffers in the system cache holding data packets sent by the packet processing pipeline hardware to the compute complex and connects the data packets in those input buffers to particular cores for processing. Ex. 26 at 17; Ex. 25 at 23; Ex. 28 at 30. The coherent mesh network (**cross connect**) connects the set of **core-specific multiplexers** to connect the input buffers of the system cache to the appropriate cores.

59.     The above allegations of infringement are preliminary and are therefore subject to change.

60.     Defendant has caused Plaintiff damage by direct infringement of the claims of the '078 patent.

61.     In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '078 patent by no later than the filing of this Complaint.

62.     At least since the date that Defendant learned of the '078 patent, Defendant's infringement has been deliberate and willful.

63.     On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '078 patent, Defendant's infringement thereof, as well as the infringement of their customers and others.

64.     Defendant has caused Plaintiff damage by direct infringement of the claims of the '078 patent.

65.     On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '078 patent.

66.     Defendant has directly infringed and continues to directly infringe the '078 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling, and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the Accused TOP IPU or components and services thereof.

67.    Defendant's infringement of the '078 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

68.    Defendant's infringement of the '078 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

69.    Defendant's infringement of the '078 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '078 patent. Defendant's continuing infringement of the '078 patent after the filing of this Complaint is particularly egregious.

70.    Defendant's infringement of the '078 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

71.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count One without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT TWO
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,561,078

72.     ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

73.     Defendant has known that it is infringing the '078 patent by no later than the filing of this Complaint.

74.     In addition to directly infringing the '078 patent, as discussed above with respect to Count One, Defendant knew or was willfully blind to the fact that it was inducing infringement of the '078 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to directly infringe by using the Accused Products in the United States.

75.     Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '078 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '078 patent with the Accused TOP IPU, as described above.  Such instructions and encouragement included, but were not limited to, advising third parties to use the Accused TOP IPU in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the Accused TOP IPU, by advertising and promoting the use of the Accused TOP IPU in an infringing manner, and distributing development kits, development machine images, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the Accused TOP IPU must be used. *See, e.g.*, Exs. 10, 23.

76.     Defendant has had actual knowledge of its indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

20

77.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '078 patent.

78.    Defendant's infringement of the '078 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

79.    Defendant's infringement of the '078 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

80.    Defendant's infringement of the '078 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '078 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

81.    Defendant's infringement of the '078 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

82.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Two without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT THREE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 8,789,065

83.     ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

84.     On July 22, 2014, the United States Patent and Trademark Office duly and legally issued the '065 patent, titled "System and Method for Input Data Load Adaptive Parallel Processing." *See* Ex. 2.

85.     Mark Sandstrom is the sole and true inventor of the '065 patent. *Id.*

86.     ThroughPuter owns all rights, title, and interest to and in the '065 patent.

87.     On information and belief, Defendant has and continues to infringe one or more claims of the '065 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the Accused TOP IPUs.

88.     Claim 1 of the '065 patent is representative of the claims infringed by Defendant and recites:

> 1.     A system for input data load adaptive processing of a set of software programs sharing a manycore processor, with each of said programs having one or more instances, and with said instances of the programs referred to as program instances, the system comprising:
>
> a collection of hardware input data ports of the processor, where each port of the collection is shared dynamically among data packets for the program instances;
>
> an array of hardware buffers, where each buffer of the array is specific to an individual destination program instance among said program instances;
>
> a logic subsystem for dynamically, at individual packet granularity, demultiplexing input data packets from said input ports to said destination program instance specific buffers based on a destination program instance indication of any given one of the packets by overhead information of the given packet;

a logic subsystem for monitoring volumes of data packets at the program instance specific buffers and for periodically assigning processing cores of the processor among individual program instances among said program instances at least in part based on the respective monitored volumes of packets at the program instance specific buffers; and

a logic subsystem for multiplexing data packets dynamically from the destination program instance specific buffers to the processor cores so that, to any given one of the processor cores, packets are multiplexed from the buffers that are specific to the program instance that the logic subsystem for assigning has presently assigned to the given processor core,

wherein, in case the system is a part of a multi-stage group of two or more of the manycore processors, at a given one of such processors, the logic subsystem monitoring volumes and for periodically assigning the processor cores of the given processor inserts an identification of a destination program for a data packet passed from the given processor to other processors of the group, to provide isolation between different programs among the set.

89.     The Accused TOP IPU is a **system for input data load adaptive processing of a set of software programs sharing a manycore processor, with each of said programs having one or more instances, and with said instances of the programs referred to as program instances.**

90.     The Accused TOP IPU includes a programmable packet processing pipeline and an array of Arm N1 Neoverse CPUs ("N1 cores"), thus each Accused TOP IPU is considered to be a **manycore processor**. Exs. 11-13, 15. The N1 core array "allows customer-provided **software [programs]** to execute features, ranging from complex packet-processing pipelines to storage transport, device management, and telemetry." Ex. 11 at 1 (emphasis added); Ex. 21 at 7–8 (the hardware "packet processing pipeline" is "[t]ightly coupled with the Compute Complex" array of N1 cores for "handoff to **software**") (emphasis added); Exs. 11–13, 15, 21. The N1 cores handling the data packet processing as part of the "complex packet-processing pipelines" are **processing a set of software programs** (packet processing software provided by Google) after the hardware packet processing pipeline handed the data packet off to the N1 cores for complex packet

processing. Ex. 11 at 1. The N1 array includes multiple cores for simultaneously handling **one or more program instances** within packet processing programs.

91.    The **software programs sharing a manycore processor** are a set of software programs running on the IPU (**manycore processor**). The set of tasks performed in a **program instance** is determined in part by the contents of the data packet for processing. Different types of data packets generally have different tasks performed on them and are therefore routed to different processing **program instances** (which represent a collection of packet processing task instances).

92.    The packet processing pipeline and traffic shaper in the Accused TOP IPU provides "QoS networking" with a hardware "traffic shaping engine capable of applying arbitrary rate profiles" that provides "[a]dvanced transmit scheduling" for transmissions from the hardware packet processing pipeline to the compute complex on the IPU. *See* Ex. 20 at 1–2 (showing the traffic shaper between the packet processing pipeline and the system cache with the input buffers); Ex. 21 at 6; *see also* Ex. 13 at 1, 4. The "QoS" includes the quality-of-service requirements for data packet delivery for processing by the N1 core array based on the performance requirements for any given application. Traffic shaping "reduces bursts, which avoids buffer overflows and thereby loss of packets caused by congestion." Ex. 19 at 1942. Traffic shaping for the transmission of data packets input from the hardware packet processing pipeline to the N1 array therefore performs **input data load adaptive processing of a set of software programs sharing a manycore processor** (the IPU being the manycore processor**)**.

93.    The Accused TOP IPU includes **a collection of hardware input data ports of the processor, where each port of the collection is shared dynamically among data packets for the program instances.**

94.    The Accused TOP IPU includes multiple inputs, which are **a collection of hardware input data ports of the processor** that receive inbound **data packets**. The Accused TOP IPU includes "16 PCIe lanes" and "Ethernet Port Logic: 4 ports" for data from the host (through the PCIe inputs) for transmission, and to the IPU from outside the host (through the ethernet inputs) on the receiving end. *See, e.g.*, Ex. 13 at 4. Streams of individual **data packets** flow continuously into each serial **port of the collection** on a packet-by-packet basis (i.e., **shared dynamically among data packets**) and are then routed by the packet processing pipeline to program instance specific input buffers, which are program-specific segments of the system level cache memory for holding data packets requiring that specific program (i.e., **data packets for the program instances**). *Id.*; Exs. 20–21.

95.    The Accused TOP IPU includes **an array of hardware buffers, where each buffer of the array is specific to an individual destination program instance among said program instances.**

96.    The Accused TOP IPU includes a hardware system level cache connecting the packet processing pipeline to the N1 core array in the compute complex. *See, e.g.*, Ex. 20–21. The packet processing pipeline determines what processing is needed for each packet based on data packet metadata, then demultiplexes the packets from the pipeline flow into input buffers (**array of hardware buffers**), which are segments of the system level cache designated for storing data packets. *Id*. Each input buffer is specific to a distinct packet flow and a specific data packet processing program for processing by the N1 core array such that data packets requiring processing by a buffer-specific program are routed to the input buffers corresponding to that specific program (**each buffer of the array is specific to an individual destination program instance among the program instances,** where the **destination program instance** is the specific program instance

that an N1 core is assigned to). *See* Ex. 21 at 8 ("metadata capabilities, including handoff to software"); Ex. 15 at 7; *see also* Ex. 14 at 6.

97.    The Accused TOP IPU includes **a logic subsystem for dynamically, at individual packet granularity, demultiplexing input data packets from said input ports to said destination program instance specific buffers based on a destination program instance indication of any given one of the packets by overhead information of the given packet.**

98.    The Accused TOP IPU receives multiple inputs of incoming streams of data packets through its PCIe and ethernet inputs to the packet processing pipeline. The data packets are demultiplexed into the packet processing pipeline for processing. The packet processing pipeline determines what processing is required by each packet, then it routes each packet to its corresponding destination buffer on an individual packet basis (**dynamically, at individual packet granularity**). Exs. 20-21. Packets from the hardware packet processing pipeline are demultiplexed into multiple input buffers for connection to the N1 core array.  The packet processing pipeline hardware thus includes a **logic subsystem for dynamically . . . demultiplexing input data packets. Individual packet[s]** are loaded into their destination input buffers (**individual packet granularity**) which are on a per-flow basis, *i.e.*, each destination input buffer is dedicated to a distinct packet processing program (**destination program instance specific buffers**). *See, e.g.*, Ex. 13 at 3 (traffic shaper "[i]ncludes μs-granularity per-flow"); Exs. 11–12, 15, 21; *see also* Ex. 14 at 6. The data packets are routed to specific buffers for connection to the N1 core array by the Accused TOP IPU packet processing pipeline based on header data (metadata) (i.e., **based on a destination program instance indication of any given packet by overhead information of the given packet**). Ex. 21 at 8.

99.    The Accused TOP IPU includes **a logic subsystem for monitoring volumes of data packets at the program instance specific buffers and for periodically assigning processing cores of the processor among individual program instances among said program instances at least in part based on the respective monitored volumes of packets at the program instance specific buffers.**

100.    The Accused TOP IPU provides "QoS networking" with a hardware "traffic shaping engine capable of applying arbitrary rate profiles" that provides "[a]dvanced transmit scheduling" for transmissions from the host to other network devices and for queues to the compute complex on the IPU itself. Ex. 20 at 1–2; Ex. 21 at 6; *see also* Ex. 13 at 1, 4. The packet processing pipeline determines what specific processing is required by each packet (which corresponds to specific sets of processing cores configured to handle that specific processing) and then routes each packet to its corresponding destination buffer in the system level cache (**program instance specific buffer**). Exs. 21–22. Generally, each packet in a flow requires the same processing and thus each flow corresponds to a given program and program instance. The program instance specific buffers are processing queues for the N1 cores.

101.    As discussed above, the Accused TOP IPU performs QoS and traffic shaping (**logic subsystem for monitoring volumes of data packets**).  This requires monitoring the status of the various queues to avoid packet loss (which is not permitted for lossless connections) and congestion (i.e., **monitoring volumes of data packets at the program instance specific buffers and for periodically assigning processing cores).**  To maintain QoS, it is also necessary to restrict the bandwidth consumed by each packet flow processing program, which in turn requires assigning core bandwidth accordingly.(i.e., **assign processing cores among individual program instances at least in part based on the respective monitored volumes** [empty or not] **of packets at the**

**program instance specific buffers**). The **assigning of processing cores** occurs **periodically,** at least as flows are terminated and new flows initiate. Thus, the packet processing pipeline, traffic shaper and related hardware **assigns processing cores among individual program instances at least in part based on the respective monitored volumes of packets at the program instance specific buffers.**

102.    The Accused TOP IPU includes **a logic subsystem for multiplexing data packets dynamically from the destination program instance specific buffers to the processor cores so that, to any given one of the processor cores, packets are multiplexed from the buffers that are specific to the program instance that the logic subsystem for assigning has presently assigned to the given processor core**.

103.    The Accused TOP IPU includes a coherent mesh network (**logic subsystem for multiplexing data packets**) for controlling the connections between the input buffers (**destination program instance specific buffers**) in the system level cache and the N1 **processor cores**. *See, e.g.*, Ex. 13 at 4 ("Coherent Mesh Network interconnect with 32MB System Level Cache (SLC)"); Ex. 21 at 8 ("Shared Mesh SLC"); Ex. 11 at 3; Ex. 16 at 7. Each **processor core** that is **assigned to a program instance** is configured to receive data packets for processing from every input buffer that is **specific to [that] program instance**. This many-buffers-to-one processing core sorting is a **multiplexing** operation, which means **packets are multiplexed from the destination program instance specific buffers to the processor core**. Data packets are routed by the coherent mesh network (**logic subsystem**), which provides the **multiplexed** connections from the input buffers to each of the N1 **processor cores** that are **specific to the program instance** associated with the packet flow being processed on the core in question (**logic subsystem for assigning has presently assigned to the given processor core**). Exs. 20–21 and 26–27; Ex. 14 at 6.

104.    Multiple IPUs are implemented as **a part of a multi-stage group of two or more of the manycore processors, at a given one of such processors, the logic subsystem monitoring volumes and for periodically assigning the processor cores of the given processor inserts an identification of a destination program for a data packet passed from the given processor to other processors of the group, to provide isolation between different programs among the set.**

105.    The Accused TOP IPUs are configured to be used in a "[s]mart [s]witch" configuration in which "[m]ultiple IPUs [(**multi-stage group of two or more of the manycore processors)**] perform packet processing for select top-of-rack (ToR) packets [(**identification of a destination program for a data packet passed from the given processor to other processors of the group, to provide isolation between different programs among the set)**]" via the polling hardware (**logic subsystem monitoring volumes**) and coherent mesh network (**logic subsystem periodically assigning the processor cores of the given processor**). Ex. 11 at 2; *see also* Ex. 13 at 2 ("Multiple IPUs perform packet processing of select packets in the data center network."). Each Accused TOP IPU includes a programmable packet processing pipeline and an array of N1 cores, thus each Accused TOP IPU is considered to be a **manycore processor**. Exs. 11–13, 15. The packet processing pipeline in the first of the multiple IPUs (the transmitting IPU) performs various functions such as TCP encapsulation, encryption, etc. and the receiving IPU performs other, sometimes complementary functions. Information in the packet header or associated metadata (**inserting an identification of a destination program**) are used by the receiving IPU to determine what processing operations (**destination program for a data packet**) are appropriate.  The identification information in the packet header or associated metadata allows the packet processing pipeline and traffic shaper hardware in the Accused TOP IPU to provide

"**[i]solation** and visibility in shared infrastructure." Ex. 13 at 3 (emphasis added).

106.    The above allegations of infringement are preliminary and are therefore subject to change.

107.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '065 patent by no later than the filing of this Complaint.

108.    At least since the date that Defendant learned of the '065 patent, Defendant's infringement has been deliberate and willful.

109.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '065 patent, Defendant's infringement thereof, as well as the infringement of their customers and others.

110.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '065 patent.

111.    Defendant has directly infringed and continues to directly infringe the '065 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the Titanium System or components and services thereof.

112.    Defendant's infringement of the '065 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

113.    Defendant's infringement of the '065 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

114.    Defendant's infringement of the '065 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '065 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

115.    Defendant's infringement of the '065 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

116.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Three without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

**COUNT FOUR**
**INDIRECT INFRINGEMENT OF U.S. PATENT NO. 8,789,065**

117.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

118.    Defendant has known that it is infringing the '065 patent by no later than the filing of this Complaint.

119.    In addition to directly infringing the '065 patent, as discussed above with respect to Count Three, Defendant also knew or was willfully blind to the fact that it was inducing

infringement of the '065 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to directly infringe by using the Accused Products in the United States.

120.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '065 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '065 patent with the Accused TOP IPU, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Accused TOP IPU in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the Accused TOP IPU, by advertising and promoting the use of the Accused TOP IPU in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the Titanium System must be used. *See, e.g.*, Exs. 10, 23.

121.    Defendant has had actual knowledge of its indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

122.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '065 patent.

123.    Defendant's infringement of the '065 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

124.    Defendant's infringement of the '065 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

125.    Defendant's infringement of the '065 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '065 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

126.    Defendant's infringement of the '065 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

127.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Four without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT FIVE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,318,353

128.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

129.    On June 11, 2019, the United States Patent and Trademark Office duly and legally issued the '353 patent, titled "Concurrent Program Execution Optimization." *See* Ex. 3.

130.    Mark Sandstrom is the sole and true inventor of the '353 patent. *Id.*

131.    ThroughPuter owns all rights, title, and interest to and in the '353 patent.

132.    On information and belief, Defendant has and continues to infringe one or more claims of the '353 patent, including claim 3, literally or under the doctrine of equivalents by

making, using, offering for sale, selling, and/or importing the components and services of the Accused TOP IPUs.

133.    Claim 3 of the '353 patent is representative of the claims infringed by Defendant. Claim 3 depends on claim 1, which recites:

1.    A system for processing a set of computer program instances, comprising:

a plurality of processing stages, at least one of the plurality of processing stages comprising multiple processing cores, wherein,

each given task of a plurality of tasks of a given program instance of the set of program instances is hosted at a different stage of the plurality of processing stages as a local task of the given program instance at the respective stage, and for at least one of the multiple processing cores of a given processing stage of the plurality of processing stages, a local task of one of the program instances is assigned as an active task instance for execution for a period of time; and

a group of multiplexers each connecting inter-task communications (ITC) data to a respective stage of the plurality of processing stages, wherein at least one multiplexer of the group of multiplexers is a hardware resource dedicated to the local task, wherein

the at least one multiplexer is configured to connect ITC data to any processing core of the multiple processing cores to which the local task is assigned for execution for the period of time.

134.    The Accused TOP IPU is a **system for processing a set of computer program instances.**

135.    The Accused TOP IPU includes an array of Arm N1 Neoverse CPUs ("N1 cores"). Exs. 14–16, 18. The N1 core array "allows customer-provided **software** to execute features, ranging from complex packet-processing pipelines to storage transport, device management, and telemetry." Ex. 11 at 1 (emphasis added); Ex. 21 at 8 (packet processing from the "packet processing pipeline" is "[t]ightly coupled with the Compute Complex" array of N1 cores for "handoff to **software**" including "vSwitch" applications) (emphasis added); Exs. 12–13, 15, 20–21. The N1 cores handling the data packet processing in the complex packet processing pipelines are **processing a set of computer program instances** for handling "customer-provided software"

(e.g., software provided by Google) for software handoff of packet processing from the hardware packet processing pipeline. *See, e.g.*, Ex. 23 at 3; Ex. 11 at 1; Exs. 12–13, 15, 17, 20–21.

136.    The Accused TOP IPU includes **a plurality of processing stages, at least one of the plurality of processing stages comprising multiple processing cores.**

137.    The N1 core array on the Accused TOP IPU performs complex packet processing pipelines, including "vSwitch and other applications." Ex. 21 at 9. Packet processing pipelines are processing operations that happen in stages, with different processing tasks generally occurring at different stages. *See, e.g.*, Ex. 31 at 36 ("*Pipelining* is a common parallel pattern that mimics a traditional manufacturing assembly line. Data flows through a series of pipeline filters [(**a plurality of stages)**] and each filter processes the data in some way.") In at least some circumstances, the complex packet processing pipelines executing on the N1 core array will include **multiple processing cores** in more than one stage. This occurs, for instance, where multiple cores are performing, at the same point in time, the same processing task on different packet flows.

138.    Furthermore, the vSwitch application supports staged pipeline processing on the N1 cores, at least through an infrastructure data path function ("IDPF") Poll-Mode Driver ("PMD"), which supports PMD threads, which are processed in stages. *See* Ex. 29 (the IPU supports the IDPF PMD driver); Ex. 30 at 1 (PMD supports staged processing tasks including "continuous polling of input ports for packets, classifying packets once received, and executing actions on the packets [in **a plurality of processing stages**] once they are classified").

139.    The Accused TOP IPU is configured such that **each given task of a plurality of tasks of a given program instance of the set of program instances is hosted at a different stage of the plurality of processing stages as a local task of the given program instance at the**

**respective stage, and for at least one of the multiple processing cores of a given processing stage of the plurality of processing stages, a local task of one of the program instances is assigned as an active task instance for execution for a period of time.**

140.    In the Accused TOP IPUs, the software **programs** running on the N1 cores include packet **processing tasks** to be performed on each data packet. *See* Ex. 21 at 8; Exs. 11–13, 15, 20–21. The **tasks** to be performed on a data packet are assigned to **processing cores**, and each core hosts **a local task of one of the program instances** of the packet processing pipeline.

141.    The N1 cores in each stage of the pipelines are **processor cores**, and as discussed above there are at least sometimes **multiple process[or] cores** in each of the **plurality of processing stages,** with the **multiple processor cores** configured to perform the stage-specific **task of a given program instance**. In the Accused TOP IPU, data packets are passed through the system level cache to the one of the N1 **cores** in a given **stage**. A **core** is selected if it is currently (**for a period of time**) hosting a **task** of the packet processing **program instance** performed on the data packet in question. In this way at least, the IPU assigns cores to process individual packets (perform **individual tasks**, each task being one of the **tasks** of the **program**).

142.    The Accused TOP IPU includes **a group of multiplexers each connecting inter-task communications (ITC) data to a respective stage of the plurality of processing stages, wherein at least one multiplexer of the group of multiplexers is a hardware resource dedicated to the local task.**

143.    The coherent mesh network provides the physical hardware connections between an N1 core and multiple buffers in the system level cache buffering ITC data, through "high-bandwidth and low-latency connections." Ex. 11 at 2; Ex. 20. Each stage buffers data in the system cache, segmented into buffers (task-specific memory segments), which the N1 processors of a

given stage connect to through the coherent mesh network (cross-connect), each N1 processor being able to access all of the memory segments associated with a given stage in the system cache through the coherent mesh network, with buffers mapped to each N1 core being a multiplexing operation performed by the coherent mesh interconnect controller. Exs. 16, 26, 28. Any **inter-task communications (ITC) data** generated by a processing stage is written to data buffer in the system level cache, and buffers holding the ITC data from one stage are accessible by each core instantiating subsequent processing stages. Each core, therefore, is associated with a **multiplexer** in the coherent mesh network **hardware** that is **dedicated to the local task** because each core performs its own local processing task.

144.    The Accused TOP IPU includes **at least one multiplexer configured to connect ITC data to any processing core of the multiple processing cores to which the local task is assigned for execution for the period of time**.

145.    The coherent mesh network provides the connections between the system level cache buffers and the N1 cores, including **multiplexers configured to connect** each buffer with **ITC data** requiring processing of a specific **local task** to the set N1 **processing cores** handling that **local task.** Ex. 13 at 4; Ex. 21 at 8. In a stage with a **local task** with parallel processing, there are **multiple processing cores to which the local task is assigned for execution for the period of time.** As discussed above, in at least some circumstances, the complex packet processing pipelines executing on the N1 core array will include **multiple processing cores** in at least one stage (**the local task**).

146.    Furthermore, the coherent mesh network connects **ITC data,** for example through the system level cache, from each stage of processing cores that execute a particular packet processing task of a program (each associated with a packet flow) to the next stage, as described

above. Exs. 12–13; Ex. 15 at 7; Ex. 21 at 8; Exs. 16 at 24–28. ITC data from one stage is passed

on to **any processing core . . . to which the local task is assigned for execution for the period**

**of time**, i.e., any N1 core that is configured for processing the next stage task. Each particular N1

core **to which the local task is assigned** receives ITC data through a **multiplexer configured to**

**connect ITC data to** the particular N1 core. The N1 core that receives the ITC data executes the

**local task** until the processing is complete (**for [a] period of time**). The coherent mesh network

**connects ITC data** after the task of the first stage of processing is complete to whichever N1 core

is configured for processing the next stage task (**any processing core . . . to which the local task**

**is assigned for execution for the period of time**) of the first stage.

147.    Claim 3 recites:

3.  The system of claim 1, further comprising:

a set of source task specific buffers each for buffering data destined for a respective task of the plurality of tasks of the given program instance located at a given stage of the plurality of processing stages; and

hardware logic for forming a hardware signal indicating whether sending ITC data is presently permitted to a given buffer of the source task specific buffers, wherein the hardware signal is formed based at least in part on a fill level of the given buffer, and the hardware signal is provided for a particular task of the plurality of tasks for which the given buffer is specific to.

148.    The Accused TOP IPU includes **a set of source task specific buffers each for**

**buffering data destined for a respective task of the plurality of tasks of the given program**

**instance located at a given stage of the plurality of processing stages.**

149.    In the Accused TOP IPU, the packet processing pipeline and traffic shaper

hardware is connected to the compute complex (including the N1 core array) through the "System

Level Cache" for hardware "handoff to software." *See* Exs. 11, 20; Ex. 21 at 7–8. The "handoff"

includes sending data packets to the system level cache, segmented into input buffers (**source task**

**specific buffers**), with each buffer configured to hold data packets associated with a given packet

flow, which generally all require the same specific processing task or set of specific processing tasks to be performed by the N1 core array. Ex. 20. As discussed above, the inputs from the hardware packet processing pipeline deliver multiple data packet streams, and incoming data packets are sorted into input buffers, each dedicated to a per-pipeline distinct packet flow. *Id.*; *see also* Ex. 14 at 6. Various packet flows require a different set of processing tasks, and each data packet is sorted into its input buffer based on the particular set processing tasks required by that data packet type (e.g., the flow to which the packet belongs). The input buffers are thus task-specific memory segments. Each of these memories is a **buffer for buffering data destined for a task** performed in the associated **processing stage (of a plurality of processing stages)** in a **given program instance**. In the Accused TOP IPU, multiple inputs are demultiplexed into input buffers, which are per-pipeline, i.e., dedicated to a distinct set of data packet processing instructions (**source task specific buffers for a respective task . . . of the given program instance**). *Id.*

150.     The Accused TOP IPU includes **hardware logic for forming a hardware signal indicating whether sending ITC data is presently permitted to a given buffer of the source task specific buffers, wherein the hardware signal is formed based at least in part on a fill level of the given buffer, and the hardware signal is provided for a particular task of the plurality of tasks for which the given buffer is specific to.**

151.     As discussed above, the TOP IPU's QoS and traffic shaping functions require metering and throttling flows to ensure that packets are not lost or substantially delayed (congestion).  That, in turn, requires monitoring and managing the buffers and controlling which packet flows are to be connected to cores (and associated buffers) at a given point in time (**hardware logic for forming a hardware signal indicating whether sending ITC data is**

**presently permitted to a source task specific buffer, wherein the hardware signal is formed based at least in part on a fill level of the given buffer**.) As discussed above, the queues are specific to certain tasks being hosted by the core and required for the packet flow in question **(the hardware signal is provided for a particular task of the plurality of tasks for which the given buffer is specific to).**

152.    The above allegations of infringement are preliminary and are therefore subject to change.

153.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '353 patent no later than the filing of this Complaint.

154.    At least since the date that Defendant learned of the '353 patent, Defendant's infringement has been deliberate and willful.

155.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '353 patent, Defendant's infringement thereof, as well as the infringement of their customers and others.

156.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '353 patent.

157.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '353 patent.

158.    Defendant has directly infringed and continues to directly infringe the '353 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into the United States, the Accused TOP IPU or

components and services thereof.

159.    Defendant's infringement of the '353 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

160.    Defendant's infringement of the '353 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

161.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '353 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

162.    Defendant's infringement of the '353 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

163.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Five without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT SIX
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,318,353

164.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

165.    Defendant has known that it is infringing the '353 patent no later than the date it received this Complaint.

166.    In addition to directly infringing the '353 patent, as discussed above with respect to Count Five, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '353 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

167.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '353 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '353 patent with the Accused TOP IPU, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Accused TOP IPU in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the Accused TOP IPU, by advertising and promoting the use of the Accused TOP IPU platform in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the Accused TOP IPU must be used. *See, e.g.*, Exs. 10, 23.

168.    Defendant has had actual knowledge of the indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

169.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '353 patent.

170.    Defendant's infringement of the '353 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

171.    Defendant's infringement of the '353 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

172.    Defendant's indirect infringement has caused and is continuing to cause damage and irreparable injury to Plaintiff, and Plaintiff will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

173.    Defendant's infringement of the '353 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '353 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

174.    Defendant's infringement of the '353 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

175.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Six without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT SEVEN
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,133,599

176.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

177.    On November 20, 2018, the United States Patent and Trademark Office duly and legally issued the '599 patent, titled "Application Load Adaptive Multi-Stage Parallel Data Processing Architecture." *See* Ex. 4.

178.    Mark Sandstrom is the sole and true inventor of the '599 patent. *Id.*

179.    ThroughPuter owns all rights, title, and interest to and in the '599 patent.

180.    On information and belief, Defendant has and continues to infringe one or more claims of the '599 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the Accused TOP IPUs.

181.    Claim 1 of the '599 patent is representative of the claims infringed by Defendant and recites:

1.  A system including processors and comprising a plurality of subsystems, implemented on hardware logic and/or software logic executing on the processors, for dynamic resource management of a pool of processing resources on behalf of application programs, the system comprising:

    a first subsystem configured to periodically allocate a plurality of processing units of the pool of processing resources among a plurality of application programs over time, wherein the plurality of processing units comprises units of at least two types of processing units and/or units of a reconfigurable type, and allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs;

    a second subsystem configured to, for each program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period, and each instance of the set of

highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a relative readiness for execution among the one or more instances of the respective application program; and

a third subsystem configured to assign, for each of the plurality of application programs, the respective set of highest priority instances to a subset of the processing units allocated by the first subsystem for the respective application program for execution during an upcoming allocation period, wherein, for at least a portion of instances of at least a portion of the plurality of application programs, a respective instance of the respective set of highest priority instances is associated with a processing unit type or configuration, wherein assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance, and prioritizing placement of the respective instance to the particular type or configuration processing unit demanded;

wherein the system is further configured to periodically adjust allocations of the plurality of processing units of the pool of processing resources over time, wherein, for each periodic adjustment, the adjusting is followed by the selecting and the assigning.

182.    The Accused TOP IPU is a **system including processors and comprising a plurality of subsystems, implemented on hardware logic and/or software logic executing on the processors, for dynamic resource management of a pool of processing resources on behalf of application programs**.

183.    The Accused TOP IPU is a **system including processors** (e.g., Arm Neoverse N1 cores) and a **plurality of subsystems implemented on hardware logic and/or software logic executing on the processors** as described below, (e.g., hardware and software for allocating N1 cores to process data packets and for assigning program instances to sets of N1 cores in a programmable packet processing pipeline), for **dynamic resource management of a pool of processing resources** (management of N1 cores allocated to processing incoming data packets using the packet processing pipeline). Exs. 11-13, 15, 20; *see also* Ex. 21 at 8 (packet processing connected to the compute complex for "handoff to software"). As discussed above, this process dynamically manages the N1 core array and assigns the cores to process various packet flows (each associated with a packet processing program) with QoS and traffic shaping algorithms.

184.    The Accused TOP IPU includes **a first subsystem configured to periodically allocate a plurality of processing units of the pool of processing resources among a plurality of application programs over time, wherein the plurality of processing units comprises units of at least two types of processing units and/or units of a reconfigurable type, and allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs.**

185.    The Accused TOP IPU includes at least **two types of processing units**, namely the N1 cores, encryption engines and specialized packet processing hardware.  Exs. 12–13, 15. It is not practical to perform encryption on N1 cores in a modern data center, rather these are handled on dedicated encryption engines.  The control firmware in the TOP IPU is updated periodically to account for changes or evolutions in packet flows.  For instance, at least as new networking protocols and approaches such as tracking techniques, security protocols, advanced gateways, system-wide flow control and overlays change, so to is the programming and allocation of the various processing units (**reallocating the plurality of processing units among the plurality of application programs**). In the Accused TOP IPU, the cores and encryption engines are **periodically** (at least as often as the updating) **allocated … among the plurality of application programs** from one program (and its set of processing tasks) to another program (and its set of processing tasks) based on the processing demands and processing allotment, and the encryption processing units are **periodically** (at least as often as the updating) **allocated among the plurality of application programs** based on **increased processing demands** (e.g., for encryption) by the application programs in a manner consistent with any priority weighting assigned to the application

programs (**allocating the plurality of processing units among the plurality of application programs is based at least in part on i) a respective processing demand of each of the plurality of application programs, and ii) a respective processing resource quota of each program of a subset of the plurality of application programs**).

186.    The Accused TOP IPU includes **a second subsystem configured to, for each program of the plurality of application programs, select a set of highest priority instances of one or more instances of a respective program, wherein a number of instances in the set of instances corresponds to a number of processing units allocated to the respective application program by the first subsystem during a current allocation period, and each instance of the set of highest priority instances is selected based at least in part on a) the number of processing units allocated to the respective program and b) a relative readiness for execution among the one or more instances of the respective application program**.

187.    The traffic shaper in the Accused TOP IPU provide "QoS networking" with a hardware "traffic shaping engine capable of applying arbitrary rate profiles" that provides "[a]dvanced transmit scheduling" for transmissions to the queues in the system level cache in the compute complex on the IPU. *See* Ex. 20 at 1–2; Ex. 21 at 6; *see also* Ex. 13 at 1, 4. The "QoS" includes the quality of service requirements for data packet delivery for processing by the N1 core array based on the performance requirements for any given application, so the traffic shaper **selects a set of highest priority instances** from among a set of customer-provided software **application programs**. Thus, the Accused TOP IPU includes a traffic shaper that is an example of **a second subsystem configured to select a set of highest priority instances.** As discussed above, each instance corresponds to one or more cores that process the task(s) of that instance (the set of application-program specific cores being an example of a **processing unit**), thus the **number of**

instances of an application program corresponds to the number of processing units allocated to the application program during a [given] allocation period.

188.     The traffic shaper selects **highest priority instances** based at least on **application program** prioritization, or equivalent techniques that determine which data packets are to be processed at a given time at least in part based on the respective monitored volumes of packets at program instance specific buffers and on processing resources available (**number of processing units allocated to the respective application program**). The traffic shaper also **selects highest priority instances** based on **a relative readiness for execution among the one or more instances of the respective application program** to maximize throughput.

189.     The Accused TOP IPU includes **a third subsystem configured to assign, for each of the plurality of application programs, the respective set of highest priority instances to a subset of the processing units allocated by the first subsystem for the respective application program for execution during an upcoming allocation period, wherein, for at least a portion of instances of at least a portion of the plurality of application programs, a respective instance of the respective set of highest priority instances is associated with a processing unit type or configuration, wherein assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance, and prioritizing placement of the respective instance to the particular type or configuration processing unit demanded**.

190.     The Accused TOP IPU includes packet processing hardware (**third subsystem**), which determines the processing required by data packets and assigns instances to specific N1 cores and to the inline crypto engine (**a subset of the processing units allocated by the first**

**subsystem**). Exs. 11–13, 15, 20–21. The packet processing pipeline hardware determines what processing is required, including complex packet processing and encryption, and directs data packets to N1 core-specific queues to assign the instances to N1 cores for complex packet processing or to the inline crypto engine for packet encryption (**assigning comprises placing the respective instance to a respective processing unit of the plurality of processing units based at least in part on the processing unit type or configuration associated with the respective instance**). *Id*. The traffic shaper also considers the weight assigned to particular instances, and thus it **prioritizes placement of the respective instance to the particular configuration processing unit demanded**. Furthermore, the packet processing pipeline and traffic shaper on the Accused TOP IPU maintain a cache holding per-queue state information, including whether the queue is empty and any priority or weighting it assigns to the queue. *See generally* Exs. 11–13, 15.

191.    The Accused TOP IPU **is further configured to periodically adjust allocations of the plurality of processing units of the pool of processing resources over time, wherein, for each periodic adjustment, the adjusting is followed by the selecting and the assigning**.

192.    As discussed above, as network traffic changes over time (e.g., packet flows terminate and new flows initiate), the Titanium System itself (automatically or at the direction of a network programmer) **periodically adjusts allocations of the plurality of processing units of the pool of processing resources over time** by reconfiguring the N1 cores to perform different tasks and revising criteria for data packets requiring processing by the inline crypto engine. *See* Exs. 20–21. Thus, by reprogramming any processing unit to a different configuration or type, the **allocations of the plurality of processing units** are adjusted. The IPU is thus **configured to periodically adjust allocations of the plurality of processing units of the pool of processing resources over time.** The **periodic adjustment** of the allocations of processing units results in a

new allocation of the processing units. The **selecting** must follow the adjustment because selecting the highest priority instances is based in part on the number of processing units allocated to an application program, which changes upon adjusting. The **assigning** must follow the **adjustment** and **selecting** because after the **periodic adjustment,** a different set of processing units is generally available for assigning than before.

193.    The above allegations of infringement are preliminary and are therefore subject to change.

194.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '599 patent no later than the filing of this Complaint.

195.    At least since the date that Defendant learned of the '599 patent, Defendant's infringement has been deliberate and willful.

196.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '599 patent, Defendant's infringement thereof, as well as the infringement of their customers and others.

197.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '599 patent.

198.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '599 patent.

199.    Defendant has directly infringed and continues to directly infringe the '599 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, and importing in this District and elsewhere in the United States, and importing into the United States, the Titanium

System or components and services thereof.

200.    Defendant's infringement of the '599 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

201.    Defendant's infringement of the '599 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

202.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '599 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

203.    Defendant's infringement of the '599 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

204.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Seven without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT EIGHT
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,133,599

205.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

206.    Defendant has known that it is infringing the '599 patent no later than the date it received this Complaint.

207.    In addition to directly infringing the '599 patent, as discussed above with respect to Count Seven, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '599 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

208.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '599 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the elements of the '599 patent with the Accused TOP IPU, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Accused TOP IPU in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the Accused TOP IPU, by advertising and promoting the use of the Accused TOP IPU in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the Accused TOP IPU must be used. *See, e.g.*, Exs. 10, 23.

209.    Defendant has had actual knowledge of its indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

210.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '599 patent.

211.    Defendant's infringement of the '599 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

212.    Defendant's infringement of the '599 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

213.    Defendant's infringement of the '599 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '599 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

214.    Defendant's infringement of the '599 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

215.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Eight without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT NINE
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,310,902

216.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

217.    On June 4, 2019, the United States Patent and Trademark Office duly and legally issued the '902 patent, titled "System and Method for Input Data Load Adaptive Parallel Processing." *See* Ex. 5.

218.    Mark Sandstrom is the sole and true inventor of the '902 patent. *Id.*

219.    ThroughPuter owns all rights, title, and interest to and in the '902 patent.

220.    On information and belief, Defendant has and continues to infringe one or more claims of the '902 patent, including claim 1, literally or under the doctrine of equivalents by making, using, offering for sale, selling, and/or importing the components and services of the Accused TOP IPUs.

221.    Claim 1 of the '902 patent is representative of the claims infringed by Defendant and recites:

1.  A system, executing on at least one of hardware logic and software logic executing on a plurality of processors, for hosting a plurality of application programs, the system comprising:

    a plurality of processing data input buffers, each input buffer of the plurality of processing data input buffers queuing data for a corresponding instance of one program of the plurality of application programs, wherein each program of the plurality of programs comprises a plurality of instances;

    an array of cores of computing capacity;

    a first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs, wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers, and a respective processing quota of each application program of at least a portion of the plurality of application programs, and allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs;

    a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program, wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum

number of the plurality of instances, and the plurality of selected instances is selected based at least in part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program, and according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores; and

a third subsystem configured, according to the controlling, to establish direct data access from each input buffer of at least a subset of the plurality of processing data input buffers to the respective core of the array of cores that is assigned to a given corresponding instance of the program for which the respective input buffer is queuing data;

wherein the array of cores is periodically allocated by the first subsystem and assigned by the second subsystem based at least in part on changes in respective volumes of processing data associated with each program of the plurality of application programs.

222.    The Accused TOP IPU is a **system, executing on at least one of hardware logic and software logic executing on a plurality of processors, for hosting a plurality of application programs**.

223.    As discussed above, the array of N1 cores "allows customer-provided **software [logic]** to execute … complex packet-processing pipelines." Ex. 11 at 1 (emphasis added); Ex. 21 at 8 (packet processing from the "packet processing pipeline" [**hardware logic**] is "[t]ightly coupled with the Compute Complex" array of N1 cores for "handoff to **software**") (emphasis added); Exs. 11–13, 15. The N1 cores handling the data packet processing in the complex packet processing pipelines are **a plurality of processors for hosting a plurality of application programs** (e.g., "customer-provided **software**" logic).

224.    The Accused TOP IPU includes **a plurality of processing data input buffers, each input buffer of the plurality of processing data input buffers queuing data for a corresponding instance of one program of the plurality of application programs, wherein each program of the plurality of programs comprises a plurality of instances**.

225.    The Accused TOP IPU includes a hardware system level cache connecting the packet processing pipeline to the N1 core array in the compute complex. *See, e.g.*, Ex. 20. The packet processing pipeline determines what processing is needed for each packet based on data packet metadata, then demultiplexes the packets from the pipeline flow into input buffers, which are segments of the system level cache designated for storing data packets (i.e., **processing data input buffers**) for processing by **queuing data for a corresponding instance of one program**. Exs. 20–21. **Each input buffer** is specific to a distinct data packet flow and processing program for processing by the N1 core array such that data packets requiring processing by a specific program are routed to the input buffers corresponding to that specific program (**instance of one program**). *See* Ex. 21 at 8 ("metadata capabilities, including handoff to software"); Ex. 15 at 7; *see also* Ex. 14 at 6.

226.    The Accused TOP IPU includes a programmable packet processing pipeline with an **array of cores of computing capacity** comprising Arm Neoverse N1 cores (each N1 core is a **core of computing capacity**). Exs. 12–13; Ex. 14 at 6; Ex. 15 at 7, 19.

227.    The Accused TOP IPU includes **a first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs, wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers, and a respective processing quota of each application program of at least a portion of the plurality of application programs, and allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs**.

228.    As discussed above, the updating of the control firmware on the Accused TOP IPU at least sometimes causes reallocating the plurality of processing units among the plurality of application programs, for example, application programs having new features and security updates.  Such reallocation is necessary to maintain throughput as packet flows in the data center change over time with respect to the advanced protocols or encryption used to create and handle them (e.g., connection tracking, packet inspection, session and overlay management, flow control and load balancing).  In the Accused TOP IPU, the N1 cores are periodically (at least as often as the updating) allocated among the plurality of application programs from one program (and its set of processing tasks) to another program (and its set of processing tasks) based on the processing demands and the encryption processing units are periodically (at least as often as the updating) allocated among the plurality of application programs based on increased processing demands (e.g., for encryption) by the application programs in a similar manner (**wherein allocating comprises allocating the array of cores of computing capacity based at least in part on a respective volume of processing data at each buffer of the plurality of processing data input buffers**). Further, in the TOP IPU each packet flow (each associated with a program instance as discussed above) is allotted a minimum bandwidth (which is a function of the QoS system) and the reallocation will at least implicitly take this into account **(and a respective processing quota of each application program of at least a portion of the plurality of application programs).** At least some of the time multiple cores are allocated or allowed to perform the same operation for the same period of time, and because a program can comprise a single packet processing task the **allocating comprises allocating more than one core of the array of cores of computing capacity to at least one of the plurality of application programs**. The TOP IPU controller thus

includes the **first subsystem configured to allocate the array of cores of computing capacity among the plurality of application programs**.

229.    The Accused TOP IPU includes **a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program, wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum number of the plurality of instances, and the plurality of selected instances is selected based at least in part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program, and according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores**.

230.    As discussed above, the Accused TOP IPU includes QoS, traffic shaping and related hardware (**second subsystem**) that routes data packets from incoming data packet streams into input buffers for processing by N1 cores, with each input buffer associated with one or more N1 cores allocated to a program for processing data packets from that input buffer (**a second subsystem configured to assign, for each program of the plurality of application programs, each core allocated to the respective program to a different instance of the plurality of instances of the respective program**).

231.    The TOP IPU at least some of the time the system does not have all core cycles fully employed hosting packet processing tasks for the various packet flows, and the QoS, traffic

shaping and related hardware assigns that bandwidth based on relative prioritization of the available packet flows for processing (**wherein the assigning results in assignment of a plurality of selected instances of the plurality of instances of the plurality of application programs, the plurality of instances comprising one or more executable instances of each program of the plurality of application programs, wherein a number of the plurality of selected instances is fewer than a maximum number of the plurality of instances**). Ex. 21 at 6, 8.

232.    As discussed above, the Accused TOP IPU includes QoS, traffic shaping and related hardware, and that hardware will assign packet flows to cores accordingly. Packet flows are assigned to cores (and/or given core cycle time) based in part on how much congestion that packet flow is experiencing. (**and the plurality of selected instances is selected based at least in part on respective volumes of processing data available for each instance of the plurality of instances of the respective program at the portion of the plurality of data input buffers queuing data for the respective program**). *See generally* Exs. 18–19.

233.    As also discussed above, the TOP IPU ensures that each flow-specific buffer is connected to the appropriate core at the appropriate time (**according to the assigning, control connectivity between the plurality of processing data input buffers and the array of cores**).

234.    The Accused TOP IPU includes **a third subsystem configured, according to the controlling, to establish direct data access from each input buffer of at least a subset of the plurality of processing data input buffers to the respective core of the array of cores that is assigned to a given corresponding instance of the program for which the respective input buffer is queuing data, wherein the array of cores is periodically allocated by the first subsystem and assigned by the second subsystem based at least in part on changes in respective volumes of processing data associated with each program of the plurality of**

**application programs.**

235.    The Accused TOP IPU includes a coherent mesh network or equivalent (**third subsystem**) that is **configured to control** the connections between the **input buffers** (memory segments in the system level cache) and the N1 **array of cores in accordance with the controlling performed by the second subsystem** (the packet processing pipeline and traffic shaper hardware and N1 polling hardware), thereby **establishing direct data access from each input buffer to the respective core of the array of cores**. *See, e.g.*, Ex. 13 at 4 ("Coherent Mesh Network interconnect with 32MB System Level Cache (SLC)"); Ex. 21 at 8 ("Shared Mesh SLC"); Ex. 11 at 3; Ex. 16 at 7; *see also* Ex. 26 at 17 ("The Neoverse N1 is required to have the *DynamIQ Shared Unit* (DSU) as an interface between the CPU and the external interconnect [fabric]. The DSU is a separate piece of logic, and contains all external interfaces for the Neoverse N1, including the bus interface."), Ex. 28 at 30. The **direct data access** between **each input buffer and their respective core in the array of cores may be assigned to a given corresponding instance of the program for which the respective input buffer is queuing data.** As discussed above, as network traffic changes over time because of old packet flow terminations and new packet flow initiations (**changes in respective volumes of processing data associated with each program**), the **first subsystem periodically allocates the array of cores** by reconfiguring the cores to perform different tasks, with more cores allocated to tasks required by higher volumes of processing data. *See* Ex. 25 at 27.

236.    The above allegations of infringement are preliminary and are therefore subject to change.

237.    In accordance with 35 U.S.C. § 287, Defendant has had actual notice and knowledge of the '902 patent no later than the filing of this Complaint.

238.    At least since the date that Defendant learned of the '902 patent, Defendant's infringement has been deliberate and willful.

239.    On information and belief, Defendant was, at a minimum, willfully blind to the existence of the '902 patent, Defendant's infringement thereof, as well as the infringement of their customers and others.

240.    Defendant has caused Plaintiff damage by direct infringement of the claims of the '902 patent.

241.    On information and belief, Defendant continues, without license, to make, use, import, market, offer for sale, and/or sell in the United States services or products that infringe the '902 patent.

242.    Defendant has directly infringed and continues to directly infringe the '902 patent by engaging in acts constituting infringement under 35 U.S.C. § 271(a), including but not necessarily limited to one or more of making, using, selling and offering to sell, and importing in this District and elsewhere in the United States, and importing into the United States, the Titanium System or components and services thereof.

243.    Defendant's infringement of the '902 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

244.    Defendant's infringement of the '902 patent has caused irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

245.    Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions

constituted an unjustifiably high risk of infringement of the '902 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

246.    Defendant's infringement of the '902 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

247.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Nine without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## COUNT TEN
## INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,310,902

248.    ThroughPuter incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

249.    Defendant has known that it is infringing the '902 patent no later than the date it received this Complaint.

250.    In addition to directly infringing the '902 patent, as discussed above with respect to Count Nine, Defendant also knew or was willfully blind to the fact that it was inducing infringement of the '902 patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties, including its customers, to indirectly infringe by using the Accused Products in the United States.

251.    Defendant has knowingly and actively aided and abetted, encouraged, and contributed to the indirect infringement of the '902 patent by instructing and encouraging its customers, purchasers, users, developers, vendors, partners, and manufacturers to meet the

elements of the '902 patent with the Accused TOP IPU, as described above. Such instructions and encouragement included, but is not limited to, advising third parties to use the Accused TOP IPU in an infringing manner through direct communications, training and support materials, and customer support regarding how to configure and use the Accused TOP IPU, by advertising and promoting the use of the Accused TOP IPU in an infringing manner, and distributing development kits, tutorials, presentations, webinars, guidelines, videos, manuals, white papers, and trainings to third parties on how the Accused TOP IPU must be used. *See, e.g.*, Exs. 10, 23.

252.    Defendant has had actual knowledge of its indirect infringement its acts induced and/or contributed to such since no later than the filing of this Complaint.

253.    Defendant has caused Plaintiff damage by direct and/or indirect infringement of the claims of the '902 patent.

254.    Defendant's infringement of the '902 patent has injured ThroughPuter in its business and property rights. ThroughPuter is entitled to recover monetary damages for the injuries arising from Defendant's infringement in an amount to be determined at trial.

255.    Defendant's infringement of the '902 patent has caused and is continuing to cause damage and irreparable harm to ThroughPuter and will continue to cause such harm unless and until Defendant's infringing activities are enjoined by this Court.

256.    Defendant's infringement of the '902 patent is willful. Defendant continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Defendant knew or should have known that its actions constituted an unjustifiably high risk of infringement of the '902 patent. Defendant's continuing infringement after the filing of this Complaint is particularly egregious.

257.    Defendant's infringement of the '902 patent is exceptional and entitles ThroughPuter to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

258.    The full extent of Defendant's infringement is not presently known to ThroughPuter. ThroughPuter makes this preliminary identification of infringing products and/or services and infringing claims in Count Ten without the benefit of discovery or claim construction in this action, and expressly reserves the right to augment, supplement, and revise its identifications based on additional information obtained through discovery or otherwise.

## PRAYER FOR RELIEF

WHEREFORE, ThroughPuter respectfully requests that the Court enter judgment against Defendant as follows:

A.    An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '078 patent;

B.    Entry of judgment declaring that Defendant's infringement of the '078 patent is willful;

C.    An order permanently enjoining Defendant from further infringement of the '078 patent;

D.    An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '065 patent;

E.    Entry of judgment declaring that Defendant's infringement of the '065 patent is willful;

F.    An order permanently enjoining Defendant from further infringement of the '065 patent;

G.      An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '353 patent;

H.      Entry of judgment declaring that Defendant's infringement of the '353 patent is willful;

I.      An order permanently enjoining Defendant from further infringement of the '353 patent;

J.      An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '599 patent;

K.      Entry of judgment declaring that Defendant's infringement of the '599 patent is willful;

L.      An order permanently enjoining Defendant from further infringement of the '599 patent;

M.      An adjudication that Defendant has directly and/or indirectly infringed one or more claims of the '902 patent;

N.      Entry of judgment declaring that Defendant's infringement of the '902 patent is willful;

O.      An order permanently enjoining Defendant from further infringement of the '902 patent;

P.      An award of damages pursuant to 35 U.S.C. § 284;

Q.      An order that the damages award be increased up to three times the actual amount assessed, pursuant to 35 U.S.C. § 284;

R.      An award to ThroughPuter of its costs, pre- and post-judgment interest, and reasonable expenses to the fullest extent permitted by law;

S.  A declaration that this case is exceptional pursuant to 35 U.S.C. § 285, and an award of attorneys' fees and costs; and

T.  An award to ThroughPuter of such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, ThroughPuter hereby demands a trial by jury on all issues so triable.

Dated:  October 7, 2025

Respectfully submitted,

*/s/ Alexis L. Ritzer*

Alexis L. Ritzer
TX Bar No. 24115116
aritzer@ga-iplaw.com

Greg Gardella (to be admitted *pro hac vice*)
ggardella@ga-iplaw.com
Cook Alciati (to be admitted *pro hac vice*)
calciati@ga-iplaw.com
**GARDELLA ALCIATI P.A.**
80 M Street SE, 1st Floor
Washington D.C. 20003
Telephone: (703) 556-9600
Facsimile: (703) 740-4541

*Attorneys for Plaintiff ThroughPuter, Inc.*